IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM BRIGGS,
      Plaintiff,
      v.

THE HARTFORD FINANCIAL
SERVICES GROUP, INC., et al.,
      Defendants.

:
:
:
:
:
:
:
:
:
:

CIVIL NO. 07-CV-5190

FILED
JUL 3 1 2009
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## MEMORANDUM AND ORDER

Rufe, J.

July 31, 2009

The parties in this putative class action alleging unlawfully deficient insurance coverage waiver forms have negotiated a stipulated class action settlement agreement ("Agreement"). That agreement, which includes a request for Plaintiff's attorneys' fees and costs and lead plaintiff compensation, is presently before the Court.[1] For the reasons that follow, the Court will approve the Agreement, finding that it is adequate, fair and reasonable, as well as the additional requests of Plaintiff.

## I. BACKGROUND

Plaintiff William Briggs ("Briggs") filed a putative class action complaint ("Complaint") against Defendants The Hartford Financial Services Group, Inc., and Property and

---

[1] The Court has jurisdiction under 28 U.S.C. § 1332(d) because it appears from the pleadings that there is diversity of citizenship between the named plaintiff and the defendants and the amount in controversy exceeds the statutory minimum of $5,000,000, exclusive of interest and costs. See Notice of Removal ("Not. Rem.") Ex. A (Complaint in William Briggs v. The Hartford Financial Services Group, Inc. and The Property and Casualty Insurance Company of Hartford, Case No. 001414 of the November, 2007 Term, Court of Common Pleas of Philadelphia County ("Compl.")) ¶¶ 20, 27, 63-71 (putative class includes over 11,000 members allegedly entitled to the bodily injury limits on their automobile insurance policies, where the minimum bodily injury limit in the State of Pennsylvania is $15,000, while 28 U.S.C. § 1332(d) calls for the aggregation of the claims of named or unnamed individual class members to determine the amount in controversy, such that amount in controversy herein exceeds $5,000,000).

Casualty Insurance Company of Hartford (collectively, "Defendants" or "Hartford") in the Court of Common Pleas of Philadelphia County, Pennsylvania on November 9, 2007.[2]  Defendants timely filed a Notice of Removal to this Court on December 7, 2007.[3]  The removal was not challenged and is facially proper.[4]

## A.  Complaint and Party Positions

In the Complaint, Briggs claims that he was injured in an automobile accident in December, 2004, while driving a car insured under an automobile insurance policy issued by Defendants ("Policy").[5]  Briggs sued and recovered some measure of damages from the insurer of the other automobile in the accident, and then sought to recover first party underinsured motorist ("UIM") benefits under the Policy.  Defendants denied Briggs' claim for UIM benefits as a consequence of a UIM coverage rejection form Briggs had previously submitted, which had been incorporated into the Policy.  Briggs alleges that the rejection form in question does not comply with the requirements of the Pennsylvania Motor Vehicle Financial Responsibility Law that governs such coverage provisions and waiver procedures ("Pennsylvania Motor Vehicle Statute").[6]  Briggs claims that, pursuant to the Pennsylvania Motor Vehicle Statute, the defective waiver form is a nullity and he is entitled to UIM coverage in an amount equal to the Policy's bodily injury coverage limits.  He

---

[2] See Notice of Removal ("Not. Rem.") Ex. A at *1 (Civil Cover Sheet for William Briggs v. The Hartford Financial Services Group, Inc. and The Property and Casualty Insurance Company of Hartford, Case No. 001414 of the November, 2007 Term, Court of Common Pleas of Philadelphia County, dated November 11, 2007).

[3] Doc. No. 1.

[4] Putative class actions may be removed, as this case was, pursuant to 28 U.S.C. §§ 1332(d)(2) and 1453 (as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (2005)).  Moreover, the removal complied in all substantive and procedural respects with the federal Removal Statute, 28 U.S.C. §§ 1441 et seq.

[5] Compl. at *2, ¶¶ 4-7.

[6] 75 Pa. Cons. Stat. Ann. § 1701 et seq.

states similar claims on behalf of a putative class, described in the Complaint as:

> "persons injured in motor vehicle accidents from 1990 to the present while occupants of motor vehicles insured under automobile policies issued by the Defendants . . . providing coverage under, <u>inter</u> <u>alia</u>, the Pennsylvania Motor Vehicle Financial Responsibility Law . . . where a Rejection of Underinsured Motorist Protection Form has been executed and where coverage has been denied by the Defendants on the basis of [such rejection form]."[7]

Briggs seeks two forms of relief in the Complaint. First, he seeks a declaration that the relevant UIM rejection form does not comport with Pennsylvania law and that the affected policies should be reformed to reflect such law.[8] Second, he requests the appointment of a special master to adjudicate class member claims for UIM benefits denied in connection with the allegedly flawed form.

In particular, the Complaint refers to requirements related to UIM coverage set forth in § 1731(c) of the Pennsylvania Motor Vehicle Statute. That section provides, in relevant part:

> (c) Underinsured motorist coverage. – Underinsured motorist coverage shall provide protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles. The named insured shall be informed that he may reject underinsured motorist coverage by signing the following written rejection form:
>
> REJECTION OF UNDERINSURED MOTORIST PROTECTION
>
> By signing this waiver I am rejecting underinsured motorist coverage under this policy, for myself and all relatives residing in my household for losses and damages suffered if injury is caused by the negligence of a driver <u>who does not have enough insurance to pay</u> for all losses and damages.  I

---

[7] Complaint ¶ 25.  As may be inferred, this action arises under the insurance law of Pennsylvania.

[8] The Court notes that, while the class definition section of the Complaint refers to a single offending UIM rejection form, the Agreement now before the Court specifies three such forms, apparently because the investigation into this matter undertaken by the parties identified additional allegedly flawed forms and so resulted in the amplification and re-definition of the putative class in this regard.  As will be seen, the notice sent in this matter to putative class members included this amplified class definition.

knowingly and voluntarily reject this coverage.[9]

The alleged defect in the form supplied to Briggs lies in the definition of "underinsured driver" thereon. Instead of the statutorily mandated language emphasized above that defines an underinsured motorist as one who "does not have enough insurance to pay," the form in question allegedly defines an underinsured motorist as one who "does not have any insurance to pay." Plaintiff's claim that the clear discrepancy between the statutory language and the language included in the supplied form warrants nullification of the relevant waivers and possibly judicial reformation of the affected policies finds support in Pennsylvania case law.[10]

Defendants generally deny all allegations of wrongdoing in the Complaint, and furthermore contend that certain affirmative defenses may entitle them to judgment on Plaintiff's claims. In the event that the requested declaratory relief were granted, however, and class member claims were adjusted on a case-by-case basis, Defendants contend that various potential practical and procedural issues could preclude or justify the denial of UIM benefits claims of individual claimants.[11]

### B. Litigation History

After the removal of this action in December, 2007, the parties undertook to further investigate the claims and explore the possibility of settlement. It appears that little or no formal

---

[9] 75 Pa. Cons. Stat. Ann. § 1731(c) (emphasis added).

[10] As Plaintiff notes, the Pennsylvania Superior Court has ruled that if a UIM waiver form does not include the exact waiver form language set forth in § 1731(c), such form is invalid, null and void. American Intern. Ins. Co. v. Vaxmonsky, 916 A.2d 1106, 1109-10 (Pa. Super. Ct. 2006). Thus, at the very least, Plaintiff's necessary threshold legal proposition – that variance from the language of § 1731(c) renders a UIM waiver form invalid – is supported, even if the range of appropriate remedies in such a case is, perhaps, less so. To that point, the Court has found no Pennsylvania case granting the remedy of reformation and special master claim adjudication in response to a UIM waiver form defect under § 1731(c), which is not to say, however, that such remedy is inappropriate.

[11] These issues include, for example, failure to provide proper notice pursuant to applicable policy requirements or proper denial of claims based on the tort election of the claimant.

discovery took place. Settlement negotiations began in earnest in January, 2008,[12] with an initial step in the process addressing how to properly define the putative class.  It appears this review and investigation revealed that Defendants issued three rejection forms containing the alleged defect to insurance policy holders at points within the relevant statute of limitations period.[13]  Modifying the definition set forth in the Complaint accordingly, the parties agreed that the putative class should be defined as:

> All those persons injured in motor vehicle accidents as the result of the negligence of an underinsured driver as defined at 75 Pa. C.S.A. 1701 et seq. from December 3, 2003 to the present while occupants of motor vehicles insured under a personal motor vehicle policy of insurance issued by Hartford, providing coverage under, inter alia, Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa. C.S.A. 1701 et seq. where Rejection of Underinsured Motorist Protection form PA-ARP-UM-37-00, PA-AR-SC-37-08-05 or PA-AR-SR-37-08-05 was executed before an accident with an underinsured motorist. The Class shall be limited to those individuals whose UIM claim occurred on or after December 3, 2003 subject to Pennsylvania Statute of Limitations.  The Class does not include any insured of Hartford where UIM rejection form DRA-838-0 or PA-AR-SR-37-06-07 was executed prior to an accident with an underinsured motorist or whose UIM claim has already been adjusted up to the bodily injury limits in the applicable policy.

The parties now ask the Court to certify the above-defined class as a facet of the Agreement.

A second step in negotiations involved seeking agreement on how to identify and notify putative class members.  The parties explored the suitability of methods relying on random sampling but ultimately rejected these options as insufficiently inclusive.[14]  The parties determined

---

[12] Mot. for Final Approval of Settlement Agreement [Doc. No. 26], Ex. B (Affidavit of Howard G. Silverman, Esquire ("Silverman Aff.")) ¶ 4.

[13] The forms were those designated PA-ARP-UM-37-00; PA-AR-SC-37-08-05; and PA-AR-SR-37-08-05. It further appears that two other UIM rejection forms previously issued by Defendants were found not to contain the alleged defects, those designated DRA-838-0 and PA-AR-SR-37-06-07.

[14] See Silverman Aff. ¶¶ 4-6.

that the only way to identify the policies that had utilized a defective form, and thus ensure adequate notice of the litigation or settlement to putative class members, was for Defendants to individually review every policy lacking UIM coverage during the relevant time period.[15]  Defendants did so, resulting in the class definition in the Agreement, which encompasses all named insureds whose policy of insurance with the Defendants did not include UIM benefits based on one of the defective forms, as well as potential derivative claimants.

The parties negotiated the monetary amount reflected in the Agreement, beginning with a statistical and actuarial analysis of the expected number of, and payout for, claims based on the alleged defect within the statutory time period.[16]  It appears that Defendants analyzed the question using actuarial methods they routinely employ to predict the likelihood and cost of potential claims under given policy provisions and state legal rules.  Through this analysis, Defendants predicted that twenty-seven claimants with valid claims existed and that Defendants' exposure on these claims would be as much as $1,215,000.[17]  Defendants made the "raw data" that underlay this determination – the method used and the information on which it was based – available to Plaintiff.[18]  Plaintiff then tested Defendants' results with the assistance of Dr. Richard Waterman, Ph.D., a statistician from the University of Pennsylvania Department of Statistics, whom Plaintiff retained.[19]  It appears the parties attempted over many months to reach mutually agreeable settlement terms, including as to

---

[15] Id. ¶ 6.

[16] Id. ¶¶ 11-13.

[17] Mot. for Final Approval of Settlement Agreement [Doc. No. 26], Ex. A (Memorandum of Law ("Pl.'s Mem.")) at 6.

[18] Id. at 17.  Plaintiff avers that this information was provided by Defendants' Director of Property and Casualty Underwriting under penalty of perjury.

[19] Silverman Aff. ¶¶ 12-13.

6

monetary amount, waiver of certain potential defenses, and an appeal mechanism for rejected claimants. They ultimately engaged the services of a retired United States Magistrate Judge to mediate the negotiations. Such mediation occurred on December 8, 2008, and a proposed settlement resulted thereafter. In January, 2009, over one year after this action was removed and docketed here, the parties submitted to the Court a proposed order (1) preliminarily approving their stipulation of settlement pending a fairness hearing; (2) approving a proposed class notice and procedure; and (3) setting a schedule for a fairness hearing. After due consideration, the Court issued the Order as proposed. The stipulation of settlement has not changed since that time, and is, in other words, the Agreement now before the Court.

## C. Agreement, Preliminary Approval and Notice

In sum, the Agreement consists of a settlement fund, from which eligible class members may recover through a specified claims process, and an agreement by Defendants not to assert certain defenses that might otherwise apply to bar such claims.[20] The Agreement establishes a third-party administrator to administer the claims process. In addition to paying valid class member claims, the gross amount in the settlement pool is allocated to pay the Plaintiff's attorneys' fees and costs, the named Plaintiff, and fifty percent of the costs of administering the settlement. Finally, the Agreement includes provisions for appealing denied claims to a claims arbitrator.

The Agreement explains and provides the following. It identifies as party defendants Property and Casualty Insurance Company of Hartford and Hartford Insurance Company of the

---

[20] The proposed Agreement is set forth in full as Attachment 2 to document number 21 on the docket in this matter.

Midwest.[21] It identifies William Briggs as lead Plaintiff, and defines the class as noted previously. It identifies Plaintiff's counsel as Howard G. Silverman, Esquire, of the law offices of Kane & Silverman, and Charles J. Schleifer, Esquire, of the firm Weinstein, Schleifer & Kupersmith, P.C., jointly.  The Agreement describes the claims on behalf of Plaintiff and the proposed class noted previously.  The Agreement also states that Hartford denies all of Plaintiff's claims, and that the Agreement should not be construed as an admission of fault or liability.  It briefly recounts the claims investigation and settlement negotiation process.  It sets forth the gross settlement amount of $2,350,000, and notes the evaluation and negotiations that informed this figure.

The Agreement specifies that Hartford is responsible for all actions and costs involved in issuing appropriate notice of the proposed settlement. It states that Hartford and the class each bear responsibility to pay 50% of the cost of administering the settlement, if approved, including all costs associated with the third party administrator and claims arbitrator.

The process by which class members may file claims is clearly set forth in the Agreement.  In sum, a third party administrator appointed by the parties will mail to all class members "proof of claim" and certification forms.[22]  Claimants must timely file such forms, which will then be subject to review by the third party claim administrator.  The objective criteria the third party administrator will use in evaluating claim forms, including, for example, whether a claim event occurred within the settlement and statutory period, are set forth in the Agreement. Hartford agrees in the document "to waive all defenses relating to failing to provide notice of an UIM claim, failing

---

[21] Hartford Insurance Company of the Midwest is not named in the Complaint.

[22] The third party administrator named in the Agreement is U.S. Bank.  Agreement ¶ D.6.

8

to preserve subrogation and/or tort election."[23]  The Agreement also appoints a claims arbitrator to hear appealed claim awards and denials,[24] and sets forth in detail the process by which he will review such appeals.[25]

The proposed settlement fund of $2,350,000 is allocated for class member claims and other matters. These include requested Plaintiff's attorneys' fees of $705,000; Plaintiff's attorneys' costs, in the amount of $5,000; compensation to named Plaintiff Briggs in the amount of $10,000; and 50% of the costs of administering the settlement, including payment of the third party administrator and claims arbitrator.  The Agreement permits distribution of payment to successful claimants only after Plaintiff's attorneys, Briggs, and administrative costs, as approved by the Court, are paid.  In the Agreement, Hartford represents that "the estimated value of the unpaid UIM claims for Class Members is no more than the Gross Settlement Amount [$2,350,000] and the estimated Net Settlement Amount [$1,630,000].  In the event that the total amount of qualified claims exceed the Net Settlement Amount, qualified claims shall be paid on a pro rata basis."[26]  For its part, through the Agreement and subsequent payment of obligations thereunder, Hartford secures a release of all claims that could have been raised by any class member in any capacity against Defendants, related to the right to receive UIM benefits and the relevant waiver forms.[27]

Upon review of the proposed stipulation and consideration of the relevant

---

[23] Agreement ¶ D.10.  Hartford expressly retains the right to challenge liability on other grounds, including that a claimant did not sign one of the contested forms or that Hartford previously adjusted the claimant's claim up to the applicable policy limits. Id. ¶ I.1.

[24] The claims arbitrator is Harris Bock, Esquire.

[25] Agreement ¶¶ D.12-15.

[26] Agreement ¶ D.4.

[27] Agreement § H.

Pennsylvania statutory and case law, the Court approved it on a preliminary basis, on February 6, 2009.[28] The preliminary approval included a provisional finding that the matter could proceed for settlement purposes as a class action pursuant to Federal Rule of Civil Procedure 23, and rulings that the class "should be apprised of the settlement terms and allowed to comment thereon and appear at a formal fairness hearing," and that the claims process should commence.[29]

The Court also approved the sample claim form and class notice materials submitted along with the proposed stipulation. Among other things these included instructions class members could follow in order to object to or opt out of the proposed settlement, provided information on the fairness hearing and set a fairness hearing date of June 8, 2009, and set a notice mailing date of March 23, 2009. Defendants supplied the third party administrator with data files from which proposed class member mailing addresses could be drawn, and the third party administrator undertook to send the approved notice and claim form to class members by the prescribed date. The third party administrator has since certified to the Court that such was done. Defendants ensured that the issuance of the notice complied with § 1715 of the Class Action Fairness Act of 2005, including the requisite notification of the relevant state and federal authorities.

In all, the third party administrator mailed notice packets to 11,276 individual addresses corresponding to identified preliminary class members on March 23, 2009.[30] Each packet contained the three Court-approved enclosures noted above: a notice of pendency of the litigation recounting its particulars, key deadlines and class member options in some detail; an "Important

---

[28] Doc. No. 21.

[29] Order Preliminarily Approving Stipulation of Settlement, February 6, 2009, at 2 [Doc. No. 21].

[30] Declaration of David Newmann, Esquire [Doc. No. 25] Ex. A ¶ 4 (Declaration of Stephanie Moore, vice president of third party administrator U.S. Bank National Association ("Moore Decl.")).

Notice" stating a series of basic questions and answers about the case and the conduct of the class action; and a claim form.[31] The third party administrator also established and maintained a toll-free telephone number and call center staffed by live call agents who could answer questions about the case.[32]   Some 1,120 of the mailed packets were returned to the third party administrator as undeliverable as addressed.  The third party administrator obtained new addresses for 866 of these, and re-mailed them by May 7, 2009.[33]

### D. Response to Notice and Fairness Hearing

In response to the mailed notices, and pursuant to instructions provided therein, preliminary class members contacted the third party administrator in various ways.  The third party administrator received over 560 calls to the toll-free number, as well as 292 opt-out letters, and 72 claim forms.  However, the third party administrator did not receive any objection to the settlement, either in the form specified in the notice materials, or otherwise, nor any objection to the proposed attorneys' fees and lead plaintiff compensation.  Likewise, no preliminary class member submitted a notice of intention to appear at the June 8, 2009 Fairness Hearing.  In sum, no objection, to any aspect of the Agreement, has been registered by a preliminary class member.

The Court held a Fairness Hearing on June 8, 2009, at which counsel provided information on the record.  No member of the proposed class appeared, either personally or through counsel.  Discussion focused on issues including the proposed appeals mechanism for rejected

---

[31] Id.

[32] The call center is staffed Monday through Friday, 9:00 AM through 5:00 PM EST.  The number was prominently displayed on both the claim form and the notice of pendency enclosed in the notice packet.  It became operative on March 23, 2009, and remains so now.  Id.

[33] Moore Decl. ¶¶ 5-6.

claims, the various requirements for class certification and the purported justification for the requested fee awards. At the conclusion of the hearing, counsel were informed that a written ruling would be forthcoming.

## II. CERTIFICATION OF SETTLEMENT CLASS

In the Agreement, the parties ask the Court to certify the proposed class pursuant to Federal Rule of Civil Procedure 23 for purposes of settlement. Thus, they present a so-called "settlement class," a device which "offers defendants the opportunity to engage in settlement negotiations without conceding any of the arguments they may have against class certification."[34] A court may approve and certify a settlement class only after performing the inquiry mandated under Rule 23(a) and (b).[35]

Rule 23(a) contains four threshold requirements for class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."[36] Two additional certification requirements apply to so-called "opt-out" class actions, such as the instant action, under Federal Rule of Civil Procedure 23(b)(3). First, "common questions must predominate over any questions affecting only individual members" ("predominance"), and second, class action litigation must be "superior to other available methods

---

[34] In re Community Bank, 418 F.3d 277, 299 (3d Cir. 2005).

[35] Id. (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997)); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2009) ("Class certification requires a finding that each of the requirements of Rule 23 has been met").

[36] Fed. R. Civ. P. 23(a). These requirements will be referred to herein as "numerosity," "commonality," "typicality," and "adequacy," respectively.

for the fair and efficient adjudication of the controversy" ("superiority").[37]  As noted previously, no objection has been registered to any aspect of the Agreement, including class certification.

Commencing the analysis, the Court finds that the proposed class is so numerous that joinder of all members is impracticable.  Over 11,000 notices were sent to proposed class members, at least 70 of these individuals have engaged in the claim process established in the proposed Agreement, and 292 others have opted out of the action.  These numbers clearly reflect a set of potential plaintiffs too numerous to be joined in a practicable fashion.  The numerosity requirement is satisfied.

The Court next turns to the requirements of commonality and predominance.  The Third Circuit Court of Appeals has stated that "the two factors should be analyzed together, with a particular focus on the predominance requirement."[38]  Initially, the Court finds that the commonality requirement is satisfied because the allegations of the proposed class arise from a single source, in a factual and legal sense.  Proposed class members received UIM waiver forms with the same alleged defect under Pennsylvania law, which led to the same allegedly improper outcome for their UIM claims.  These basic factual and legal similarities support a finding of commonality here.[39]  Further, where a defendant "engage[s] in standardized conduct, arguably giving rise to contractual claims by the class, the commonality and predominance requirements of Rule 23 are satisfied."[40]  The claims presented relate to standardized insurance waiver forms that are contractual in nature.  An initial

---

[37] Fed. R. Civ. P. 23(b)(3); In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004).

[38] In re Warfarin, 391 F.3d at 528.

[39] Commonality "does not require that all class members share identical claims." In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 310 (3d Cir. 1998).

[40] First State Orthopaedics v. Concentra, Inc., 534 F. Supp. 2d 500, 511 (E.D. Pa. 2007).

legal dispute in any individual class member's case would be whether the terms of the waiver form comport with Pennsylvania law regarding insurance contracts, and all class member claims would be materially, and perhaps decisively, affected by the resolution of this legal issue. The core legal and factual similarity of potential class member claims predominates over the factual differences among individual claims that will appear during the claims process. The predominance factor is also met.

Next, in the typicality evaluation, the Court assesses whether Briggs's incentives in the litigation are aligned with those of the proposed class.[41] "Factual differences will not render a claim atypical if the claim arises from the same . . . practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."[42] Nor must a lead plaintiff bring every claim that could be asserted by members of the class in order to meet the typicality standard.[43] Briggs's claims arise from the same alleged UIM waiver form defect that provides the basis for the claims of the proposed class. Consequently, Briggs's litigation incentives are the same as those of the proposed class – to show that the UIM forms supplied by Defendants were defective under Pennsylvania law, that claims denied on the basis of the forms were denied improperly, and that payment of such claims is now warranted as a remedy. The typicality requirement is satisfied.

The Court proceeds to consider the adequacy of the representative plaintiff, Briggs. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named

---

[41] Beck v. Maximus, 457 F.3d 291, 296 (3d Cir. 2006).

[42] Id.

[43] In re Community Bank, 418 F.3d at 303.

parties and the class they seek to represent. . . . [A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."[44]   In evaluating Briggs's fitness to "fairly and adequately protect the interests of the class,"[45] the Court examines whether his claims are "antagonistic to the class" and whether his attorneys "are experienced and qualified to prosecute the claims on behalf of the entire class."[46]

Plaintiff's counsel has repeatedly averred to the Court that Briggs's interests are not in conflict with those of the proposed class.[47] After an ample notice period and a fairness hearing, not one of over 11,000 notified proposed class members has objected to this proposition or submitted any statement or information suggesting that Briggs's claims are antagonistic to the class. Moreover, in foregoing paragraphs, the Court has identified predominant fundamental factual and legal similarities between the claims of Briggs and those of the proposed class. These similarities lend credence to Plaintiff's assertion of an absence of conflict. In sum, there is no basis for a finding that Briggs and the proposed class have conflicting interests in this litigation.

As for the second aspect of the adequacy inquiry, "[c]ourts examining settlement classes have emphasized the special need to assure that class counsel: (1) possess adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant."[48] Regarding experience, Plaintiff's counsel Howard Silverman has over twenty-three years' experience

---

[44] Amchem, 521 U.S. at 625 (quotations and citations omitted).

[45] Fed. R. Civ. P. 23(a).

[46] Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

[47] See, e.g., Pl.'s Mot. for Final Approval of Settlement Agreement, at 11.

[48] In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 801 (3d Cir. 1995).

practicing in the area of class action litigation, primarily in state and federal courts in Pennsylvania and New Jersey.  His experience is adequate.

Regarding counsel's conduct of this action, and as noted previously, it appears that counsel has duly investigated the strength of Defendants' position and the underlying legal merits of the asserted claims, and that the proposed settlement terms were negotiated at arm's length, including under the supervision of a hired mediator in December, 2008, over the course of at least one year since the matter commenced.  The settlement reached does not grant questionable benefit to Defendants, such as by releasing categories of potential claims of class members that were not previously asserted in the Complaint.[49]  Nor was it reached on the basis of plainly insufficient information.  Pre-settlement investigation by the parties sought to assess the legal strength of Briggs's claim in light of Pennsylvania insurance law, to quantify and identify potential class members, and to predict Defendants' claim exposure to the class but for the challenged UIM waiver forms.  Due to the narrow focus of Plaintiff's claims, for a declaration that a particular waiver form provision was improper under governing law and for the adjustment of claims denied on the basis of such provision, and given the fact that other types of insurance-related claims, such as for bad faith, would not seem to be implicated by the question of the legality of an express policy provision, this investigation suffices to support the settlement.  These considerations, along with the duration of settlement negotiations and the absence of an inordinately large attorney's fee request,[50] suggest

---

[49] See In re Community Bank, 418 F.3d at 307-08 (questioning the adequacy of class representation given absence of discovery, aspect of collusion between defendants and plaintiff's counsel, a rapid settlement that gave defendants a release on categories of claims not asserted in the complaint or otherwise noted in the settlement, and an outsized attorneys' fee).

[50] The Court notes that the attorney's fee request appears to have been negotiated simultaneously with, and as an aspect of, the proposed Agreement.  There is no rule barring the simultaneous negotiation of fees and settlement awards, but the Third Circuit Court of Appeals has more than once explained that the timing of fee

that the proposed settlement did not result from collusion, but from the vigorous efforts of counsel.[51] Without objection, the Court finds counsel duly seasoned and qualified to litigate this action for the proposed settlement class.

Next, considering the superiority requirement, the Court must "balance, in terms of fairness and efficiency, the merits of a class against those of alternative available methods of adjudication."[52] In accordance with the relevant inquiry under Rule 23(b)(3),[53] which is described in the margin, the Court first finds little class member interest in individually controlling the matter. No class members objected to the Agreement, evincing an absence of class member interest in controlling this action, and just under 2.7% of the notified class members have elected to opt-out and potentially bring their own claims. Next, it does not appear that any related cases were pending in state or federal court at the time this action was initiated, nor can the Court find any issue that would render this forum undesirable. Assuming individual class members were to bring civil actions on their own behalf, case-by-case litigation of the more than 11,000 proposed class members' claims would be wastefully duplicative and inefficient by any measure. Alternatively, no other, less-

---

negotiations in class action settlements may factor into a court's assessment of adequacy, and in particular, collusion, during negotiations. See id. at n. 25 (citing In re General Motors, 55 F.3d at 804). In this case, for reasons stated above, the Court does not have significant concerns that counsel failed to vigorously perform in the interests of the proposed class or to deal at arm's length with Defendants. The timing of the fee request does not materially alter this assessment.

[51] See id. at 307-08.

[52] First State, 534 F. Supp. 2d at 515.

[53] "Federal Rule of Civil Procedure 23(b)(3) instructs that the matters pertinent to this inquiry include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum." In re Community Bank, 418 F.3d at 309 (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996)). When deciding whether to certify a settlement class, a fourth consideration stated in the Rule, regarding the difficulty in managing the class through the course of litigation, need not be considered. Id.

encompassing class or set of sub-classes appears that would rival the efficiency of the proposed class here and would promise greater fairness.[54] Qualifying proposed class member claims covered by this case will rest on basically similar legal and factual grounds, as noted, and redundant class action or individual litigation of these common issues would needlessly drain party and judicial resources when the vehicle of a single class action stands as an available alternative. No fairness issue has been raised around the class treatment proposed in this case, and fairness to proposed class members will be advanced by avoiding inefficient, case-by-case or multi-class litigation scenarios. The superiority requirement is satisfied.

Finally, the Court evaluates the quality of the notice preliminarily approved by the Court and issued herein pursuant to the Order of February 6, 2009.[55] The notice must satisfy the due process clause of the Fifth Amendment and the requirements of Rule 23. "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class."[56] Due process thus requires "reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class."[57] In addition, notice of a Rule 23(b)(3) class action, such as that presented here, must meet the

---

[54] For example, multiple, potentially applicable state legal regimes, as might argue in favor of smaller, state-based classes, are not present in this case, which proceeds under Pennsylvania law alone.

[55] Doc. No. 21.

[56] In re Prudential, 148 F.3d at 306.

[57] Id. Courts in this Circuit have stated that "[t]he notice must be reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Nichols v. SmithKline Beecham Corp., No. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. April 22, 2005) (quoting Lachance v. Harrington, 965 F. Supp. 630, 636 (E.D. Pa. 1997)).

requirements of Federal Rules of Civil Procedure 23(c)(2)(B)[58] and 23(e).  Rule 23(c)(2)(B) directs that the notice must explain the legally binding effect of the class action on class members, the opportunity to opt out of the class, and the opportunity to appear through counsel.  It also provides that individual notice should be sent to members whenever reasonably possible. Rule 23(e) "requires that notice of a proposed settlement must inform class members: (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information is available from the court files; and (4) that any class member may appear and be heard at the Fairness Hearing."[59]  As with the proposed Agreement, there has been no objection to the notice herein.  The notice plainly reported the claims at issue, defined the proposed class, described the details of the proposed settlement, explained that complete information was available through the Court, and notified individuals of their entitlement to appear through an attorney and of the steps necessary to opt out of the class.   The notice was mailed directly to class members by a third party settlement administrator that received recent addresses of proposed class members from Defendants and when necessary made reasonable efforts to locate individual members through an address finder service.

---

[58] Rule 23(c)(2)(B) provides:

"For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

(i)   the nature of the action;
(ii)  the definition of the class certified;
(iii) the class claims, issues, or defenses;
(iv)  that a class member may enter an appearance through an attorney if the member so desires;
(v)   that the court will exclude from the class any member who requests exclusion;
(vi)  the time and manner for requesting exclusion;
(vii) the binding effect of a class judgment on members under Rule 23(c)(3)."

Fed. R. Civ. P. 23(c)(2)(B) (2007).

[59] In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig., MDL No. 1203, 2005 WL 636788, at *18 (E.D. Pa. Mar. 15, 2005).

In these ways, the notice process comported with the requirements of due process and Rule 23.

Having found that the relevant requirements of Rule 23 are satisfied in this case, the Court will certify the proposed settlement class.

## III. EVALUATION OF SETTLEMENT TERMS

The Court next assesses the terms of the Agreement in an inquiry governed by Federal Rule of Civil Procedure 23(e) and related case law.

### A. Legal Standard

Under Federal Rule of Civil procedure 23(e), "[t]he claims . . . of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."[60]  Generally, settlements are favored in the class action context.[61]  Yet the district court functions "as a fiduciary who must serve as a guardian of the rights of absent class members" when evaluating a proposed settlement.[62]  This function assumes heightened importance in cases, like this one, in which formal class certification is not sought until settlement negotiations between a putative representative plaintiff and the defendants have reached fruition in an agreement that includes a class to be certified for settlement purposes only.[63]  The Third Circuit Court of Appeals has noted the considerable problems courts and commentators have identified with settlement classes,[64] as well as their

---

[60] Fed. R. Civ. P. 23(e) (2007).

[61] In re General Motors, 55 F.3d at 785.

[62] Id.

[63] Id. at 787.

[64] Id. at 787-90 ("[i]n effect, settlement classes can, depending on how they are used, evade the processes [contemplated in Rule 23 that are] intended to protect the rights of absentees").

potentially substantial benefits,[65] and requires district courts to evaluate them pursuant to Rule 23 with particular care.[66] Here, in light of the foregoing considerations, and in its discretion,[67] the Court may accept the proposed Agreement only if the parties have shown it to be fair, reasonable, and adequate.[68]

## B. Discussion

As noted, by Order of February 6, 2009, the Court preliminarily approved the present Agreement.[69] It did so after duly reviewing the proposed document and relevant legal sources and also after monitoring the progress of this matter, through written party reports and telephone conferences, since its removal over a year earlier. "This preliminary determination establishes an initial presumption of fairness when the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small number of the class objected."[70] The first, third and fourth elements are easily satisfied, as the Court has previously made findings as to Briggs's counsel's experience, the lengthy and arm's length quality of negotiations, and the fact that no class members have objected. While it appears that no formal discovery occurred in this case, the Court deems sufficient the investigation the parties undertook early in this litigation. The asserted basis for Defendants' liability is a UIM waiver form provision that allegedly violates a particular dictate of

---

[65] Id. at 790-92.

[66] Id. at 794.

[67] Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975).

[68] Fed. R. Civ. P. 23(e)(2); In re General Motors, 55 F.3d at 785.

[69] See Doc. No. 21.

[70] In re Cendant Corp. Litig., 264 F.3d 201, 232 n.18 (3d Cir. 2001).

Pennsylvania insurance law. The language in the challenged forms hardly required extensive discovery to ascertain. And once ascertained, the question of liability was one of law, requiring a judicial ruling on the import and consequences of the identified language discrepancy. For experienced counsel to reasonably predict the outcome of such a legal ruling did not require discovery. However, to knowledgeably – and ethically – settle on behalf the proposed class required an appreciation not only of the legal basis for liability, but also of potential damages for actual liability. This, in turn, necessitated information on several matters, among them the number of individuals and policies in question, the relevant policy limits, and actuarial predictions as to the number and value of affected claims. Counsel obtained information on these matters that informed the settlement negotiated. Thus, while Plaintiff undertook little or no formal discovery on the merits, it is proper to credit as adequate the investigation of counsel prior to negotiating the Agreement, and a presumption of fairness applies to the same. With this presumption in place, the Court next determines whether the Agreement is fair, reasonable, and adequate under Rule 23(e).

In <u>Girsh v. Jepson</u>, the Third Circuit Court of Appeals promulgated a nine-factor test courts should use in analyzing the quality of a class action settlement.[71] The nine factors are:

> (1) The complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[72]

---

[71] <u>Girsh</u>, 521 F.2d 153.

[72] <u>In re Cendant</u>, 264 F.3d at 232 (quoting <u>Girsh</u>, 521 F.2d at 156-57).

The Court reviews the Agreement in light of these factors, in turn, below.

## 1. Complexity, expense and likely duration of the litigation

This factor seeks to "capture[] the probable costs, in both time and money, of continued litigation."[73]  The Court finds that this class action, involving a class of over 11,000 members, would be complex, expensive and long-lived if litigated to final judgment. The sheer size of the class informs this finding.  While the legal basis for liability could likely be determined through a properly tailored declaratory action, assuming such liability was established, the remedial phase of the litigation would predictably take years of case-by-case evaluation, potentially under the auspices of a special master overseen by the Court.  In this posture, individual claims would potentially face any of an array of defenses, as applicable, based on particular policy terms or Pennsylvania law.[74] Parties and counsel would be required to expend a great deal of time and money on discovery and other preparation in advance of potentially thousands of individualized hearings and negotiations over "the bottom line."  At a minimum, the Court would be obliged to remain in a supervisory position to the proceedings until their conclusion. Post-judgment motions and appeals "would further prolong the litigation and would significantly reduce the value of any monetary recovery" by class members.[75]  As the complexity, expense and likely duration of this litigation would be great, the first <u>Girsh</u> factor weighs in favor of the settlement.

---

[73] <u>In re Warfarin</u>, 391 F.3d at 535-36 (quoting <u>In re Cendant</u>, 264 F.3d at 233).

[74] As noted, Defendants waived several such defenses on a global basis as an aspect of the proposed settlement.

[75] <u>First State</u>, 534 F. Supp. 2d at 517 (citing <u>In re Warfarin</u>, 391 F.3d at 536).

## 2. Reaction of the class

This factor seeks to gauge class member support for the proposed settlement.[76]  As noted, 11,276 notices were mailed to preliminary class members, some 1,120 of the packets were returned as undeliverable, and the third party administrator re-sent 866 of these after obtaining new addresses through a search service. Thus, 11,022 notices were mailed to class members at apparently serviceable addresses.  No class members objected in any fashion to the proposed settlement, while 292 individuals exercised their option to opt out of the class.  Put otherwise, less than 2.7% of the class opted out.  It is therefore fair to infer that a vast majority – over 97% – of the class supports the Agreement.  The Court finds that the second Girsh factor supports approval of the settlement.

## 3. Stage of Proceedings and Discovery

This factor "captures the degree of case development that class counsel has accomplished prior to settlement," permitting a court to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating."[77]  In Section III.B, above, the Court explains its rationale for finding that counsel adequately investigated the merits of this action before reaching a settlement agreement with Defendants.  This finding applies to the present analysis.  In sum, counsel could reasonably estimate the strength and value of the case at the time of settlement negotiations based on an assessment of Pennsylvania law, the waiver form provisions at issue, and actuarial and statistical analyses of the expected number and value of claims. In this case, further investigation or discovery was not necessary to adequately inform negotiation.  This Girsh factor favors settlement.

---

[76] In re Prudential, 148 F.3d at 318.

[77] In re Warfarin, 391 F.3d at 537 (quotation and citation omitted).

24

## 4. Risks of establishing liability

Considering this factor, the Court assesses "what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them."[78] The Court cannot find that there would be any particular risk of Plaintiff losing this action for a declaratory judgment as to the requirements of Pennsylvania insurance law. In a similar case, the Pennsylvania Superior Court ruled that a UIM waiver form that lacked the language prescribed in § 1731(c) of the Pennsylvania Motor Vehicle Act was void[79] – the same ruling Plaintiff seeks here, and which would serve as the basis for Plaintiff's attendant request for policy reformation and claim adjudication under a special master's supervision. Of course, Defendants would likely present counter-arguments on the legal question, but they would be constrained to do so against the backdrop of Pennsylvania case law described above, which would seem to favor Plaintiff's position. Thus, this Girsh factor does not favor settlement.

## 5. Risks of establishing damages

"This inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time."[80] The Court finds persuasive Plaintiff's contention that even if he and the class were to win judgment on the legal question presented, some class members entitled to coverage may nonetheless be precluded from recovery by defenses based on provisions of their insurance policies or applicable law. As an aspect of the settlement, however, Defendants agreed to waive certain such defenses or objections, including those based on a claimant's failure to comply

---

[78] In re Cendant, 264 F.3d at 237.

[79] Vaxmonsky, 916 A.2d at 1109-10.

[80] In re General Motors, 55 F.3d at 816.

with notice requirements in his or her policy. Thus, class members will face fewer obstacles in pursuing claims via the process contemplated in the proposed settlement than they would if litigating claims for damages in court or a court-ordered adjudicative process. As one reasonably predictable result, more class members should actually secure a recovery through the settlement claims process than would through continued litigation. In any event, the outcome of litigation is uncertain. In contrast, this settlement confers on class members a sure opportunity to pursue recovery on valid claims. The Court finds that this <u>Girsh</u> factor favors settlement.

## 6. Risks of maintaining the class action through trial

In light of the certification analysis undertaken above, in which the Court concludes that the instant settlement class readily meets the requirements for certification under Rule 23, the Court discerns no reason to find that the class would be vulnerable to decertification or modification in the litigation and trial context.[81] Plaintiff's theory of liability is straightforward and predicated on a legal issue presented for declaratory judgment which affects all class members in the same way. This total identity of cause of action asserted by class members, and the fact that it derives exclusively from a narrow point of Pennsylvania's insurance law, would seem to reduce the likelihood of divisive issues emerging around the Rule 23 certification factors. This case is thus unlike cases involving class members that have some similar but some different legal claims, such as potential claims under laws of multiple jurisdictions, resulting in intra-group tensions. The parties have presented no argument on this point. This <u>Girsh</u> factor does not support the proposed settlement.

---

[81] <u>See</u> <u>In re Cendant</u>, 264 F.3d at 239 (citing Fed. R. Civ. P. 23(a)).

## 7. Defendants' ability to withstand greater judgment

The Court takes judicial notice of the fact that Defendants are major, well-capitalized American corporations that could collectively withstand a judgment larger than $2,350,000. The parties have presented no argument on this factor. The Court finds that it does not support the proposed settlement.

## 8. and 9. Range of reasonableness of settlement against best possible recovery and in light of all attendant risks of litigation

These factors capture "whether the settlement represents a good value for a weak case or a poor value for a strong case."[82] The Court begins by noting that this is not a case in which conventional damages are sought; rather, the Complaint seeks declaratory judgment, reformation of insurance contracts, and creation of a quasi-judicial claims process through which legitimate claimants may recover on claims they could have brought but for the alleged policy defects. As the action is conceived, then, the total recovery will be limited by the number of members bringing valid claims and their respective policy coverage limits. Only those class members with valid claims will recover anything, as is, of course, appropriate. To evaluate the settlement against the best possible recovery, it is essential to grasp how many valid claimants may reasonably be predicted to exist, and the probable value of their claims. In their investigations, as noted, the parties trained their focus on those questions. Defendants' actuarial analysis predicted that their total exposure on such claims would be $1.215 million. Briggs accepted this estimate after a hired consultant reviewed it. Meanwhile, a net balance of $1,630,000 will remain from the settlement fund of $2,350,000 if the Court approves Plaintiff's fees, costs and compensation requests totaling $720,000. This $1,630,000

---

[82] First State, 534 F. Supp. 2d at 520 (citing In re Warfarin, 391 F.3d at 538).

net amount will be allocated to pay 50% of the costs of administering the settlement through the third party administrator and the claims arbitrator before it becomes available to pay class member claims. The projected cost of administering the settlement is $88,400.[83] Thus, the pool from which class member claims would be paid is expected to be reduced by approximately $44,200, or one half of $88,400, leaving an expected net settlement amount of $1,585,800, or $1,630,000 less $44,200. Given that the estimated value of predicted valid claims is $1.215 million, and that the expected net settlement amount available for claims under the Agreement exceeds this figure by over $370,000, the Court finds that the settlement amount is reasonable relative to the best possible recovery.

This conclusion applies even more strongly when the settlement is considered in light of all the risks of litigation. More obstacles to recovery, such as certain defenses waived in the Agreement, would exist in litigation than exist in the settlement. Additionally, there is no guarantee that Plaintiff would prevail in the threshold declaratory judgment ruling that is a predicate to any recovery. These Girsh factors weigh in favor of the settlement.

In sum, a presumption of fairness applies to the Agreement and the preponderance of Girsh factors support its approval. The Court thus finds that the proposed settlement is fair, reasonable and adequate.

## IV. ATTORNEYS' FEES AND COSTS AND LEAD PLAINTIFF COMPENSATION

Plaintiff's counsel requests attorneys' fees in the amount of $705,000, partial reimbursement of costs in the amount of $5,000, and compensation to Briggs as lead plaintiff in the

---

[83] See Joint Submission Regarding Third Party Administrator and Claims Arbitrator Fees §§ 3-4 [Doc. No. 33].

amount of $10,000.  The Court must thoroughly review these requests.[84]

The Third Circuit Court of Appeals has approved the "percentage of the recovery" method for determining appropriate attorneys' fees in common fund cases,[85] such as the instant case. Accordingly, the Court "first calculates the percentage of the total recovery that the proposal would allocate to attorneys' fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case."[86]

Plaintiff's counsel request a fee that is 30% of the total amount paid out by Defendants under the Agreement.[87]  When evaluating whether a fee based on a percentage of recovery is appropriate, a district court should consider several non-exclusive factors, including:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of non-payment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.[88]

Assessment of attorney fee award requests should be robust.[89]

The fund negotiated by counsel on behalf of the settlement class is in the amount of $2,350,000.  This amount well exceeds the value of predicted claims as determined by the parties,

---

[84] In re General Motors, 55 F.3d at 819.

[85] In re Rite Aid Corp. Secs. Litig., 396 F.3d 294, 300 (3d Cir. 2005).

[86] In re Cendant, 264 F.3d at 256.

[87] That is, 705,000 is 30% of 2,350,000; 705,000 divided by 2,350,000 equals 0.3, or 30%.

[88] Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n. 1 (3d Cir. 2000).

[89] In re Rite Aid, 396 F.3d at 301-02.

which is $1,215,000. If the requested attorneys' fees were awarded, over $1.6 million would remain in the pool for the payment of valid class member claims and the class's agreed-upon portion of certain costs. As we have seen, these costs are predicted to be $44,200, such that the actual amount expected to be available for class member claims is $1,585,800. The fund benefits a class of over 11,000 members by affording them an available, dedicated pool from which to secure recovery on UIM claims after the relatively streamlined claims process established in the Agreement. It appears that 72 class members have timely submitted claim forms. Some number of these claimants will materially benefit from the class by recovering on previously precluded UIM claims. The Court finds that the fund is of ample size, and that it confers a benefit on many individuals. This factor favors approval of the requested fees.

Next, not a single objection to the requested fee award has been submitted. The requested amounts were described in detail in the notice mailed directly to class members. In these circumstances, the absence of objections to the fee request supports a finding that it is appropriate and reasonable.[90]

Next, the Court considers the skill and efficiency of Plaintiff's counsel, "as measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel."[91] As previously discussed, Plaintiff's counsel obtained a positive result for the class. The Court is not aware of any notable difficulties presented by this litigation. Recovery for class members with valid claims would

---

[90] Id. at 305.

[91] Nichols, 2005 WL 950616, at *22 (citation omitted).

30

appear to be imminent. The claim review process is underway, so that recovery should be obtained within approximately two years of the original filing of this action, a relatively speedy and efficient result in the class action context. The Court has already found class counsel to be experienced in such matters. Considering the result,[92] counsel appears to have prosecuted the case with adequate skill and professionalism, opposed by qualified and experienced defense counsel. This factor supports the fee request.

The liability issues presented in this matter are not particularly complex, but given the scale of the class, the matter of fashioning an appropriate remedy – assuming liability – is. As a result of this complexity and other factors settlement negotiations lasted well over one year before the Agreement could be finalized. Throughout this period, and to date, Plaintiff's counsel have not been paid. Thus, Plaintiff's counsel, proceeding on a contingent fee agreement, risked nonpayment due to the nature of the case and the inherent risk of losing.[93]   There was no guarantee that Plaintiff would prevail in the declaratory action if the parties litigated. Even victory in the declaratory action would not guarantee payment, since Defendants would likely be able to present an array of defenses, including several waived in the Agreement, in any remedial phase. Successfully asserted, these defenses could substantially reduce any attorney award based on a percentage of actual recovery by class members. Counsel's prospects for fees would further dim if class certification were to be contested and denied, or if a class, once certified, were later de-certified. The risk of non-payment

---

[92] In future class actions in federal court, Plaintiffs' counsel will assist the court if in legal memoranda they cite to federal cases interpreting the applicable federal Rules and standards. In this case, the Court was not aided by counsel's frequent reliance on cases from the Pennsylvania state courts discussing Pennsylvania's class action rules. See Pl.'s Mot. for Final Approval.

[93] No risk of nonpayment to the plaintiff class appeared in this case from a concern that Defendants were near a state of bankruptcy. See Gunter, 223 F.3d at 195 n. 1 (risk of nonpayment is significant where the defendant is near insolvency).

in this litigation, as well as its complexity and duration, favors approval of the fee request.

As for the amount of time devoted to the case, Plaintiff's counsel have submitted an affidavit stating that Howard Silverman and members of his firm have spent "750 to 850 total office hours" on the case.[94]  He spent "600 to 700 hours," while his associates and paralegal spent "approximately 150 hours" on the matter.[95]  The case was filed in November of 2007, and by its nature required counsel to have investigated and researched the matter a significant amount before that time.  The Agreement was submitted to the Court in early 2009, and since then, counsel have been obliged to make several filings and to appear at the Fairness Hearing.  Plaintiff's counsel also have an ongoing obligation under the Agreement to represent any class members who engage the claim appeal process before the claim arbitrator.  Thus, Plaintiff's counsel have already devoted well over one year to this matter, and their work has not concluded.  This factor supports approval of the fee request.

The 30% fee requested herein mirrors fee requests in comparable cases involving settlement amounts of similar size.[96]  Also, as a general matter, the Third Circuit has "noted three studies which found that fee awards of approximately 30% of the common fund were not unusual."[97]  The Court's assessment of awards in similar cases suggests that the fee award requested is

---

[94] Decl. of H. Silverman in Support of Brief of Class Counsel, at 2 ("Counsel Aff.") [Doc. No. 32].  Counsel avers that his office did not keep detailed, contemporaneous time records for work performed on this case because he assumed he would be compensated through an award based on a percentage of the recovery.  Id.  Hence, the hours reflected herein are counsel's estimate.  No information is before the Court regarding work performed by Mr. Schleifer, or his firm.

[95] Id.

[96] See Martin v. Foster Wheeler Energy Corp., No. 06-0878, 2008 WL 906472, at *1 (M.D. Pa. March 31, 2008) (awarding 30% attorneys' fees in mass tort class action settlement totaling $1.64 million, and collecting class action cases involving 30-33 percent fee awards on settlement amounts between $1.79 million and $7 million).

[97] Nichols, 2005 WL 950616, at *22 (citing In re Rite Aid, 396 F.3d at 303).

appropriate and reasonable.[98] For the foregoing reasons, the requested award of attorneys' fees will be approved.

Plaintiff's counsel also requests reimbursement of costs in the amount of $5,000. Reasonable reimbursement of litigation costs is appropriate for counsel whose effort leads to a settlement fund that benefits a plaintiff class. Given the duration of this litigation, counsel's efforts herein and the result achieved, the requested costs are found to be reasonable and will be approved.

Last, the Court considers the requested compensation award for the lead Plaintiff, Briggs. There have been no objections to the requested award. Aside from his status as putative lead plaintiff, and despite a request from the Court for the same, counsel have not offered the Court any information regarding contributions to the litigation by Briggs, or indeed, any participation or activity on his part relative to the case. Yet, "[j]udges of this district have not hesitated to assure that those undertaking class litigation are not penalized for placing a class's interest above their own."[99] And it is surely proper to provide reasonable incentives to individual plaintiffs whose willingness to participate as lead plaintiffs allows class actions to proceed and so confer benefits to broader classes of plaintiffs. The $10,000 requested for Briggs is a modest sum relative to the $2.35 million overall settlement fund. It is reasonable and will be approved.

_____

[98] Finally, the Third Circuit has recommended that district courts perform a "cross-check" of a fee award using the lodestar method. In re Rite Aid, 396 F.3d at 305. To calculate the lodestar, a court multiplies the number of hours reasonably worked by a reasonable hourly billing rate, considering the geographical area, the nature of the work, and attorney experience. Gunter, 223 F.3d at 195 n. 1. It is appropriate to consider summaries of hours worked as opposed to detailed billing records. In re Rite Aid, 396 F.3d at 306-07. Here, accepting the summary of hours and rates set forth in class counsel's affidavit, and calculating from the middle of any hour-ranges therein, the Court finds that class counsel's lodestar is $351,750. The requested fee award is approximately 2 times the lodestar, a multiplier that is well within the reasonable range. See First State, 534 F. Supp. 2d at 524 (citing In re Cendant, 243 F.3d at 742). The lodestar cross-check supports the requested fee award.

[99] Cullen v. Whitman Medical Corp., 197 F.R.D. 136, 145 (E.D. Pa. 2000).

## V.  CONCLUSION

For the reasons set forth above, the Court makes the following rulings.  The proposed settlement class meets the requirements for certification under Federal Rule of Civil Procedure 23, and thus is certified as a settlement class with William Briggs as lead plaintiff.  The proposed settlement similarly satisfies all applicable legal requirements.  In particular, it is fair, reasonable, and adequate.  Accordingly, it is approved.  The requests for attorneys' fees and costs, and for incentive payment to the lead plaintiff, are reasonable and appropriate and are approved.

An appropriate order follows.